# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-04073-01-CR-C-BCW |
| | ) | |
| DAVID LEE HARRIS, JR. | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is Defendant David Lee Harris Jr.'s motion to suppress evidence and suggestions in support thereof. (Doc. No. 20). Mr. Harris alleges suppression is warranted for the following reasons: (1) the officer extended the traffic stop beyond constitutionally permissible limits; (2) the officer's search of the vehicle could not be justified as a search incident to the arrest of Mr. Harris; (3) the officer's search of the vehicle could not be justified by consent because consent was refused; (4) the officer's discovery of the empty holster, which led to a further search that found a pistol, cannot be justified based on the "plain view" doctrine; and (5) the officer's search of the vehicle could not be justified by the existence of probable cause. (Doc. No. 20). The Government has filed suggestions in opposition conceding that the following legal doctrines are inapplicable in this case: (2) the doctrine of search incident to arrest; (3) the consent exception; and (4) the "plain view" doctrine. (Doc. No. 24 at 6). Mr. Harris filed a reply on the remaining two issues: (1) whether Officer Overton extended the traffic stop beyond constitutionally permissible limits; and (5) whether Officer Overton had sufficient probable cause to search the vehicle pursuant to the "automobile exception." (Doc. No. 30). The Court held an evidentiary hearing regarding Mr. Harris' pending motion to suppress on September 19, 2017.

## Factual Background

On September 21, 2016, at approximately 3:36 a.m., David Lee Harris Jr. was driving a white Nissan Maxima northbound on Highway 63 at Clark Lane in Columbia, Missouri.

Columbia, Missouri Police Officer Bradley Overton initiated a traffic stop on the Nissan for having no front license plate and suspicion of having windows with a tint darker than the thirty-five percent legal limit. The Nissan was displaying a dealer plate on the rear of the vehicle. (¶ 1, Officer's Narrative). The vehicle had three additional occupants: Kayla Glasgow, the vehicle owner, was seated in the front passenger seat; Sherwin Mahaney was seated directly behind Ms. Glasgow; and Kathleen Gilmore was seated directly behind the driver's seat. Both Mr. Mahaney and Ms. Glasgow refused to identify themselves to Officer Overton or other officers on the scene during the entire duration of the traffic stop.

Officer Overton walked around the back of his patrol car and approached the vehicle from the passenger side rear. Officer Overton requested that the passenger roll the right rear window all the way down so that he could see inside the vehicle. (Bodycam Video at 08:37.43). According to Officer Overton's narrative, the rear passenger, later identified as Mr. Mahaney, was moving around and "fidgeting." (Suppression Hearing Transcript "Tr." at 12). Mr. Mahaney refused to identify himself during the duration of the stop and was later identified by a prison identification card as Sherwin Mahaney. (Tr. at 26).

Officer Overton then began to speak directly with Ms. Glasgow who provided her identification and indicated that she was the owner of the vehicle. (Bodycam Video at 08:38.10). Officer Overton noted that Ms. Glasgow seemed extremely nervous and overly friendly when she was looking for her identification and insurance. (Tr. at 18). Officer Overton then engaged Mr. Harris about having a valid driver's license. (Bodycam Video at 08:38.57). When questioned about why Ms. Glasgow was not driving, Mr. Harris said, "we went out to get something to eat real quick and we're headed back home." (Bodycam Video at 08:39.10). Mr. Harris then provided Officer Overton with his full name and date of birth. (Bodycam Video at 08:39.25).

Officer Overton then inquired about the physical condition of the rear passenger later identified as Ms. Gilmore, asking, "[i]s she okay over there?" (Bodycam Video at 08:39.34). Officer Overton testified that Ms. Gilmore appeared to be asleep for most of the traffic stop and that it was unusual behavior. (Tr. at 17). Ms. Gilmore refused to provide any identification for the duration of the stop. (Tr. at 26). When Officer Overton asked if Ms. Glasgow knew the back female passenger's name, she said, "I know her as 'K'" as Officer Overton walked away from the vehicle. (Bodycam Video 08:41.22).

2

Officer Overton used his radio to request backup and returned to his patrol vehicle to run a records check on Mr. Harris and Ms. Glasgow. (Bodycam Video at 08:41.34-43). While waiting for backup, Officer Overton was informed that Mr. Harris had a suspended license, a parole violation warrant for failure to register as a sex offender, and a history of prior offenses involving firearms. (Bodycam Video at 08:45.15). Ms. Glasgow was identified as having prior offenses involving the possession of heroin. (Bodycam Video at 08:45.35).

Once backup arrived, Officer Overton placed Mr. Harris into custody for driving while revoked and having an outstanding warrant. (Bodycam Video at 09:49.52). Mr. Harris was placed into Officer Overton's patrol car. (Bodycam Video at 08:50.40). Officer Overton believed Mr. Mahaney was refusing to identify himself because he had a warrant. (Bodycam Video at 08:51.06). After securing Mr. Harris, Officer Overton then asked Mr. Mahaney to step from the vehicle and requested permission to search him. (Bodycam Video at 08:51.43). Officer Overton testified that as Mr. Mahaney exited the vehicle, he identified a green leafy substance on the floor as marijuana "shake," which are little pieces of marijuana that fall off during the handling and using of marijuana, particularly when rolling blunts. (Tr. at 21). Officer Overton did not collect any of the "shake" marijuana. (Tr. at 42).

When Officer Overton returned to close the door, he briefly shined his flashlight on Ms. Gilmore and the rear floorboard. (Bodycam Video at 08:52.27). Officer Overton again asked about the rear female passenger, and Ms. Glasgow said that he should wake her up and that "she might be on something." (Bodycam Video at 08:52.34). Ms. Glasgow was asked by Officer Overton to step from the vehicle and walk towards the rear of his patrol vehicle, toward Officer Overton's backup. (Bodycam Video at 08:52.47).

Officer Overton then returned to the right rear door of the vehicle, flashed his flashlight on the floorboard, and began examining a blue drawstring bag. (Bodycam Video at 08:53.22). Officer Overton then attempted to wake Ms. Gilmore via verbal commands. (Bodycam Video at 08:53.35). Ms. Gilmore, sounding groggy, told Officer Overton that she had "a really bad headache and did not realize that they were pulled over," and that she gets "really bad migraines." (Bodycam Video at 08:54.17). Ms. Gilmore refused to provide her name or identification. (Bodycam Video at 08:54.21). Ms. Gilmore was asked to step from the vehicle and she complied. She indicated that there was a knife on the backseat near where she was sitting. (Bodycam Video at 08:55.10). Officer Overton identified and inspected the knife before

3

placing it back on the rear passenger seat. Officer Overton also picked up and smelled a cigarette on the seat. (Bodycam Video at 08:59.23-52).

Officer Overton returned to his patrol vehicle where he questioned Mr. Harris about the vehicle's unidentified rear passengers. Mr. Harris said, "I know him as 'Matt' […] that is his girlfriend; she was with him when we picked them up." (Bodycam Video at 08:56.30-50). Officer Overton asked a colleague to "grab the VIN before I let them go." (Bodycam Video at 08:57.27). Mr. Harris was then questioned by Officer Overton about the presence of drugs in the vehicle and the bags in the backseat. (Bodycam Video at 08:59.45).

The other officers on the scene and Officer Overton had a conversation about the two passengers who refused to identify themselves. (Bodycam Video at 09:02.54). Officer Overton exited his patrol car and went to speak with Ms. Glasgow at the rear of the vehicle. (Bodycam Video at 09:06.40). Ms. Glasgow was questioned about the packages in the backseat. (Bodycam Video at 09:07.15). Ms. Glasgow told Officer Overton that they had their bags because they were taking them to the bus station. (Bodycam Video at 09:08.02). Officer Overton questioned Ms. Glasgow's truthfulness about not knowing the rear passengers because she "picked them up" (Bodycam Video at 09:08.10). Ms. Glasgow then said, "I just got picked up and he took us to get food." (Bodycam Video at 09:08.17). When questioned again about the identity of the rear passenger, Ms. Glasgow said she knows her only as "K." (Bodycam Video at 09:08.43). Ms. Glasgow asked if she could leave, and Officer Overton replied, "yup, just a second." (Bodycam Video at 09:09.24). Without requesting permission, Officer Overton then walked over to the vehicle and began searching in the front driver's seat area of the vehicle and discovered a holster and ammunition. (Bodycam video at 09:09.55).

Officer Overton returned to his patrol vehicle and had Mr. Mahaney placed in handcuffs and detained. Officer Overton proceeded to question Ms. Glasgow about the presence of the holster and ammunition. Ms. Glasgow says that she was "picked up from her house to go get food." (Bodycam Video at 09:11.09). Officer Overton returned to the vehicle and conducted a further search of the car, and found loose 9mm rounds of ammunition and a box of 9mm rounds in the center console. Officer Overton also located a box of 9mm rounds in the backseat in a black camera-like case. (Bodycam Video at 09:15.58). Officer Overton's search of a green pouch in the vehicle revealed three pipes with burnt marijuana smell coming from them and two plastic baggies with residue that tested positive for methamphetamine. (Bodycam Video at

4

09:16.40-52). After questioning Ms. Gilmore about the green pouch, Officer Overton arrested and fingerprinted Ms. Gilmore. (Bodycam Video 09:19.30).

Officer Overton returned to the vehicle again and located a Kel-Tech, Model P-11, 9mm semi-automatic handgun, serial #AA1L86, directly below the driver's seat, within Mr. Harris' reach. Officer Overton proceeded to secure and make safe the weapon. (Bodycam Video at 09:22.51). Officer Overton then had Ms. Gilmore detained for "lying like the rest of them." (Bodycam Video at 09:24.50). Once inside the trunk, Officer Overton stated that it "smells like weed back here." (Bodycam Video 09:29.14). Officer Overton returned to his vehicle to retrieve an evidence bag and then returned to the vehicle to bag evidence. (Bodycam Video at 09:36.28). Officer Overton began bagging evidence, but did not collect any of the "shake" marijuana. (Bodycam Video at 09:37.50).

Officer Overton read Mr. Harris his Miranda warnings before questioning him again. (Bodycam Video 09:39.30). Mr. Harris said that anything in the backseat belonged to Mr. Mahaney and Ms. Gilmore since they were "supposed to be taking them to the bus station." (Bodycam Video at 09:40.20). Mr. Harris then said that the gun recovered by Officer Overton belonged to a friend named Christopher Roberts. (Bodycam Video 09:40.36). Mr. Harris said he was not wearing the gun and indicated that he had on a different belt and the pill bottle recovered by Officer Overton also belonged to Mr. Roberts. (Bodycam Video 09:41.01). Mr. Harris then offered Mr. Roberts' location to Officer Overton. (Bodycam Video 09:41.31). Officer Overton returned to the vehicle to check the tint on the windows. (Bodycam Video at 09:50.35). Officer Overton released Ms. Glasgow to leave with the vehicle. (Bodycam Video at 09:51.24).

## Analysis

Based on the Government's concessions of several of Mr. Harris' arguments, the only issues left to consider are: (1) whether Officer Overton extended the traffic stop beyond constitutionally permissible limits; and (2) whether Officer Overton had sufficient probable cause to search the vehicle pursuant to the "automobile exception." The Court will address each of these issues below.

### A. Reasonable Suspicion to Extend Traffic Stop

The Court finds Officer Overton had sufficient reasonable suspicion to justify extending the stop to address his suspicion. Mr. Harris concedes that the traffic stop was lawful at its

5

inception, since it was based on probable cause that a traffic violation had occurred. "Following a traffic stop, police officers may conduct, 'a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning.'" United States v. Roberts, 687 F.3d 1096, 1099-1100 (8th Cir. 2012) (quoting United States v. Munoz, 590 F.3d 916, 921 (8th Cir. 2010)). In the instant case, Mr. Mahaney, Ms. Gilmore, and Ms. Glasgow all exhibited unusual or "nervous" behavior that Officer Overton found suspicious. (¶ 2, Officer Narrative). "If 'the officer develops reasonable suspicion that other criminal activity is afoot, the officer may expand the scope of the encounter to address that suspicion.'" United States v. Chartier, 772 F.3d 539, 543 (8th Cir. 2014) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)) (internal citations omitted); United States v. Riley, 684 F.3d 758, 764 (8th Cir. 2012) (holding that "Riley's nervous condition, his difficulty in answering basic questions about his itinerary, and his failure to be forthright about his criminal history relating to drugs" were enough for reasonable suspicion). The nervous behavior of Mr. Mahaney and Ms. Glasgow was enough for Officer Overton to detain them for a reasonable amount of time. Additionally, the state of Ms. Gilmore being asleep in the backseat of the car was not addressed until 20 minutes into the stop. (Bodycam Video at 08:55.10). The total length of the stop was 1 hour and 15 minutes. Therefore, the Court does not find that the traffic stop was extended beyond constitutional limits because Officer Overton had sufficient reasonable suspicion to justify extending the stop to address his suspicions.

### B. Probable Cause to Search the Vehicle

This Court finds that Officer Overton did have sufficient probable cause to search the entire vehicle and that the subsequently discovered evidence should not be suppressed. Police officers may "conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." United States v. Farnell, 701 F.3d 256, 264 (8th Cir. 2012) (quoting United States v. Kennedy, 427 F.3d 1136, 1140-1141 (8th Cir. 2005)). "Probable cause exists where there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Donnelly, 475 F.3d 946, 954 (8th Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 212, 238 (1983)). "In determining whether an officer had probable cause to search, courts apply

a common sense approach and consider all relevant circumstances." Farnell, 701 F.3d at 264 (internal citations omitted).

The Government contends that based on the totality of the circumstances, Officer Overton had probable cause to search the entire vehicle. The Government points to: (1) the backseat movement and "fidgeting" of Mr. Mahaney; (2) Mr. Mahaney's refusal to divulge his name to Officer Overton; (3) the friendliness and nervousness of Ms. Glasgow; (4) Ms. Gilmore's refusal to divulge her name to Officer Overton and sleeping through the traffic stop; (5) Mr. Harris and Ms. Glasgow's drug related criminal histories; (6) the presence of marijuana "shake" on the back floorboard of the vehicle; and (7) the contradictory statements of the driver and passenger about their final destination. (Doc. No. 24 at 10). The Court finds that the totality of the circumstances presented supports a finding of probable cause.

This Court finds that Mr. Mahaney's "fidgeting" is consistent with nervous behavior and may create reasonable suspicion. "[W]e have often held that nervousness and other 'subjective perceptions' are valid factors supporting reasonable suspicion." De La Rose v. White, 852 F.3d 740, 746 (8th Cir. 2017) (quoting United States v. Bloomfield, 40 F.3d 910, 918 (8th Cir. 1994) (en banc). Officer Overton testified that Ms. Glasgow appeared very nervous, but that her initiation of the conversation was consistent with that of a vehicle owner. (Tr. at 63). Officer Overton also testified that the sleeping passenger was an anomaly that further heightened his suspicion. (Tr. at 16). The Government also raises a discrepancy in destination stories between passengers to support Officer Overton's suspicions. United States v. Lebrun, 261 F.3d 731, 733-734 (8th Cir. 2001) (holding that the occupants of the vehicle giving vague and differing answers was enough to raise reasonable suspicion). Mr. Harris stated that the occupants of the vehicle were going to get something to eat and then going home. (Bodycam Video at 08:39.10). Ms. Glasgow told Officer Overton that they were taking Mr. Mahaney and Ms. Gilmore to the bus station after getting food. (Bodycam Video at 09:08.17). While these stories are not necessarily inconsistent, they were told from different perspectives and corroborated at different times leading to Officer Overton's suspicion. Mr. Harris then corroborated the story about going to the bus station when he was questioned the final time. (Bodycam Video at 09:40.20).

The Government relies on United States v. Mayo, where the Court found that the officer had probable cause to believe contraband would be found in a vehicle where he observed nervousness, contradictory passenger statements about travel, the defendant's significant drug

7

related criminal history, and drug packaging in "plain view." 627 F.3d 709, 713 (8th Cir. 2010). The Court in Mayo cites to United States v. Hill, where the officer had probable cause to search the defendant's vehicle given his "nervous behavior, his warrant for a controlled substance crime, his reputation for engaging in drug activity, and most importantly, a drug dog's alert." 386 F.3d 855, 858 (8th Cir. 2004) (citing Mayo, 627 F.3d at 713). In Hill, the Court found that the determinative factor was "most importantly, the indication from a qualified drug dog that drugs were in the vehicle." Id. See also United States v. Linkous, 285 F.3d 716, 721 (8th Cir. 2002) (holding that where a qualified drug dog alerts to the presence of contraband in a vehicle, officers have probable cause to search that vehicle). In Mayo, the Court found that the "significant additional facts of Braiske's drug history and the discovery in 'plain view' of bindles with drug markings" supported the finding of probable cause. 627 F.3d at 714.

With the additional facts presented in Mayo and Hill, the Eighth Circuit has held that similar facts lead to the determination of probable cause over reasonable suspicion. Compare United States v. Sanchez, 417 F.3d 971, 975-76 (8th Cir. 2005) (holding that the officer had reasonable suspicion to expand the traffic stop after observing the defendant's "increasingly nervous behavior," defendant provided false identification, and two defendants provided "conflicting stories"). The additional fact in the present case that is dissimilar to Sanchez is the presence of "shake" marijuana.

The Court rejects Mr. Harris' assertions that Officer Overton erred in failing to mention the presence of marijuana "shake" to other officers or was unable to identify the substance at that time of night. Officer Overton testified that he "was able to see on the seat in the floorboard a green leafy substance that [he] believed was marijuana, shake marijuana." (Tr. at 20). Great deference is given to "officer's experience" and "specialized" training because "[a] trained officer draws inferences and makes deductions . . . that might well elude an untrained person." United States v. Binion, 570 F.3d 1034, 1039 (8th Cir. 2009) (citing United States v. Cortez, 449 U.S. 411 (1981). Additionally, after reviewing the body camera video, the Court finds that there is a substance on the floor of the vehicle. (Bodycam Video at 08:53:17). The Court finds Officer Overton's testimony to be credible and relies on his training and experience in the identification of the substance.

In United States v. Johnson, the presence of marijuana "shake," coupled with the officer's observation of the smell of marijuana, and the usage of a masking agent established probable

8

cause to search. 2014 U.S. LEXIS 159521 (D. Minn., Nov. 12, 2014). Here, while Officer Overton stated that he never smelled marijuana, (Tr. at 51) the presence of marijuana "shake" observed on the back floor mat of the vehicle, combined with all the suspicious factors highlighted above, are enough based on the totality of the circumstances to support a finding of probable cause. See United States v. Booker, 269 F.3d 930, 932 (8th Cir. 2001) (concluding that the officer seeing cannabis residue on the floor of the car before the completion of the traffic stop generated probable cause to justify the subsequent search of the vehicle) (citing United States v. Burnett, 791 F.2d 64, 67 (6th Cir. 1986)) (concluding that police officer's observation of marijuana on the floorboard of a lawfully stopped car constituted probable cause to search the entire car). Therefore, the Court, find that the evidence in this case, based on the totality of the circumstances, established probable cause to search the vehicle. See Mayo. Having so found, suppression of the evidence in the instant case is not warranted.

## Conclusion

For the reasons stated above, the Court concludes that the Defendant's contentions regarding suppression of evidence in this case are without merit, and the motion to suppress should be denied.

IT IS THEREFORE RECOMMENDED that defendant Brown's motion to suppress evidence should be DENIED. (Doc. No. 20).

Counsel are reminded that they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve exceptions by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

Dated this 4th day of October, 2017, at Jefferson City, Missouri.

/s/ *Willie J. Epps, Jr.*
WILLIE J. EPPS, JR.
United States Magistrate Judge